# In the United States Court of Federal Claims

No. 13-54

(Filed: January 12, 2015)

```
*************************************
                                    *
W.E. PARTNERS II, LLC,              *
                                    *
              Plaintiff,            *
                                    * American Recovery and Reinvestment
v.                                  * Act, Section 1603; Open-Loop Biomass
                                    * Facility; Reimbursement Grant; Eligible
THE UNITED STATES,                  * Cost Basis; I.R.C. Sections 45, 48.
                                    *
              Defendant.            *
                                    *
*************************************
```

*Stephen G. Leatham*, Heurlin, Potter, Jahn, Leatham, Holtmann & Stoker, P.S., Vancouver, Washington, for Plaintiff.

*Shelley d.A. Leonard*, with whom were *Tamara W. Ashford*, Acting Assistant Attorney General, *David I. Pincus*, Chief, *G. Robson Stewart*, Assistant Chief, U.S. Department of Justice, Tax Division, Court of Federal Claims Section, Washington, D.C., for Defendant.

OPINION AND ORDER

WHEELER, Judge.

This case arises under Section 1603 of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, 364 ("Section 1603"). Plaintiff W.E. Partners II, LLC ("WEP II") funded the construction of an open-loop biomass facility in Lewiston, North Carolina next to a Perdue chicken rendering plant to which it provides steam. The facility was designed and now operates to meet Perdue's steam needs for the chicken rendering processes. The facility includes a steam-turbine generator to produce electricity from the steam before it passes through to process the chicken. The electricity generation allows the plant to qualify for state and federal renewable energy incentives. Section 1603 provides for reimbursement of a portion of the costs incurred for "a facility using open-loop biomass to produce electricity." Internal Revenue Code ("I.R.C.") § 45(d)(3) (2012). The question presented is whether WEP II is entitled to reimbursement

of a percentage of the total cost of the facility ($9,037,769), or only of the lesser costs associated with the portion of the facility necessary to produce electricity. At the prescribed 30 percent reimbursement rate, WEP II claims entitlement to $2,711,331, whereas the Department of Treasury has allowed only $943,754. The difference, $1,767,577, is in dispute. The issue is before the Court on cross-motions for summary judgment.

The question to be resolved is primarily one of statutory interpretation. While the language of the statute, if read without context or reference to agency guidance, might suggest that reimbursement based on total cost is mandatory whenever a facility uses open-loop biomass to generate electricity, the Court does not agree with such an outcome. When read in conjunction with the applicable Internal Revenue Service ("IRS") Notice and Treasury Department Guidance, the Court finds that Section 1603 requires only reimbursement for the portion of the cost that is fairly allocable to the production of electricity. Accordingly, the Court grants summary judgment in favor of Defendant.

Background[1]

A. W.E. Partners II and the Biomass Facility

Plaintiff WEP II is a single-purpose limited liability company formed in 2010 to design, construct, and operate a biomass boiler facility at a Perdue chicken rendering plant in North Carolina. This biomass facility burns forest products waste (e.g., limbs, bark, sawdust, shavings) and agricultural residue (e.g., peanut and soybean hulls, cotton gin residue) to produce steam. The steam is then used for industrial manufacturing processes, to produce electricity, or both. Boiler facilities that produce steam for industrial processes are known as process steam plants, and boilers used for electrical generation are known as power generation plants. Boilers that utilize steam for both industrial processes and energy generation are known as cogeneration plants. The WEP II biomass facility is a cogeneration plant. In this cogeneration plant, the steam from a biomass boiler is routed through an electricity generating turbine before being used for other industrial processes, such as for the chicken rendering plant. The amount of electricity generated is a function of the steam flow, temperature, and pressure of the steam passing through the turbine. Pressure and temperature drop while passing through the turbine, while the steam flow remains constant. Increased steam flow or drops in temperature or pressure across the turbine increases the amount of electricity generated.

---

[1] The facts are drawn from the parties' briefs and are not in dispute. At oral argument on December 15, 2014, counsel for both parties agreed that the material facts are not contested, and that the Court may decide the matter on the cross-motions for summary judgment.

The WEP II facility uses three boilers, each with a heat input of 29.4 million Btu (mmBtu), a steam flow of 20,700 pounds per hour (pph), and a pressure of 325 pounds per square inch (psi). All steam produced by the boilers passes through a 495 kilowatt (kW) turbine that generates electricity and releases the steam at a pressure of 135 psi. This lower pressure steam can then be used in the chicken rendering plant. In total, 2.2 percent of the useful energy that the WEP II facility produces is electrical energy, and 97.8 percent is thermal energy.

### B. Section 1603 of the American Recovery and Reinvestment Act of 2009

President Obama signed the Recovery Act into law on February 17, 2009. Although a detailed discussion of the statute is not necessary here, the purpose of the Act was to create jobs and promote economic recovery, in part by spurring investments in specified technologies. § 3, 123 Stat. at 116.

Section 1603 of the Recovery Act permits investors in qualifying renewable energy property to apply for a reimbursement of costs in lieu of a tax credit. 123 Stat. at 364. Section 1603(a) provides that the Secretary of the Treasury "shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b)." Id. at 364. Section 1603(b) provides that "[t]he amount of the grant . . . shall be the applicable percentage of the basis of such property." Id. The applicable percentage is contingent on the type of energy property placed into service. Id. at 364-65. Section 1603(d)(1), which is applicable here, includes "[a]ny qualified property (as defined in section 48(a)(5)(D) of the Internal Revenue Code of 1986) which is part of a qualified facility (within the meaning of section 45 of such Code)." Id. at 365. Section 1603(d)(1) allows a cost reimbursement of 30 percent. Id. at 364-65. Section 1603 uses the definitions of "qualified property" and "qualified facility" from Sections 45 and 48 of the Internal Revenue Code to describe the energy properties eligible for a 30 percent reimbursement. Id. at 365; see also I.R.C. § 45, 48. Section 1603 also gives the Treasury Department the authority to "recapture [] the appropriate percentage of the grant . . . as the Secretary of the Treasury determines appropriate" if the property "ceases to be a specified energy property." 123 Stat. at 365.

I.R.C. Section 48 provides that "the term 'qualified property' [includes] . . . (I) tangible personal property, or (II) other tangible property (not including a building or its structural components), but only if such property is used as an integral part of the qualified investment credit facility." I.R.C. § 48(a)(5)(D). As provided in Section 1603, qualified property under I.R.C. Section 48 must also be part of a qualified facility under I.R.C. Section 45. 123 Stat. at 365. For the facility at issue here, Section 45 provides that a qualified facility is "a facility using open-loop biomass to produce electricity . . .

3

the construction of which begins before January 1, 2014." I.R.C. § 45(d)(3)(a). Qualified property of an open-loop biomass facility under Section 45 is further defined by I.R.S. Notice 2008-60:

> (1) *In general*. For the purposes of § 45(d)(3), an open-loop biomass facility is a power plant consisting of all components necessary for the production of electricity from open-loop biomass (and, if applicable, other energy sources). Thus, a qualified open-loop biomass facility includes all burners and boilers (whether or not burning open-loop biomass), any handling and delivery equipment that supplies fuel directly to and is integrated with such burners and boilers, steam headers, turbines, generators, and all other depreciable property necessary to the production of electricity . . . .

I.R.S. Notice 2008-60 § 3.01(1), 2008-30 I.R.B. 178.

The Treasury Department also promulgated guidance for Section 1603 applications, explaining that "Qualified Facility Property is property that is an integral part of a qualified facility described in IRC section 45(d) . . . (1) . . . [and for open loop biomass facilities] uses open-loop biomass to produce electricity." U.S. Treasury Dep't, Payments for Specified Energy Property in Lieu of Tax Credits under the ARRA of 2009 12-13 (rev. April 2011). The Treasury Guidance further explains the appropriate cost basis for components of a qualifying facility that are not attributable to a qualifying activity and costs that are attributable to both nonqualifying and qualifying activities:

> The eligible basis of a qualified facility does not include the portion of the cost of the facility that is attributable to a nonqualifying activity. For example, for a biomass facility that burns fuel other than open-loop biomass or closed-loop biomass, the eligible cost basis is the percentage of the total eligible costs that is equal to the percentage of the electricity produced at the facility that is attributable to the open-loop biomass and closed-loop biomass. In the case of costs that relate to both a nonqualifying activity and a qualifying activity, the costs must be reasonably allocated between the nonqualifying and qualifying activities. For example, if combustion equipment burns both qualifying biomass and other fuel, the equipment's eligible cost basis is limited to the percentage of its otherwise eligible cost corresponding to the percentage of the equipment's electricity production that is attributable to the qualifying biomass.

Id. at 17.

    C.  <u>The Treasury Department's Review of the WEP II Section 1603 Application</u>

The National Renewable Energy Laboratory (NREL), a Department of Energy laboratory, assists the Treasury Department in reviewing Section 1603 applications for reimbursement. In its assessment of WEP II's Section 1603 application, the NREL calculated that a biomass boiler with a heat input of 8.4 to 11.2 mmBtu would be sufficient to power a 495 kW turbine. Thus, one of WEP II's three 29.4 mmBtu boilers would be more than sufficient to power the facility's 495 kW turbine. Accordingly, the NREL determined that one-third of the WEP II facility's costs could be attributed to electrical production and it recommended an eligible cost basis that included all costs associated with the turbine and one third of all other costs. The revised calculations indicated an eligible cost basis of $3,145,847 and a Section 1603 reimbursement of $943,754.

    D.  <u>History of Proceedings</u>

On June 25, 2012, WEP II submitted a Section 1603 reimbursement application for the biomass facility. WEP II claimed an eligible cost basis of $9,037,769 and requested reimbursement of $2,711,331 (30 percent of the cost basis). On December 9, 2012, the Treasury Department issued an award letter approving a reimbursement of only $943,754, which represented the cost of the turbine and one-third of all other costs, including the boilers. On December 21, 2012, WEP II sent a protest email to the Treasury Department program indicating its disagreement with the reduced award.

WEP II filed its complaint in this Court on January 22, 2013, asserting that the Government violated its mandatory obligation to award reimbursement grants in the amount of 30 percent of the eligible cost basis of a biomass facility. WEP II further asserted that the Treasury's evaluation of its application and failure to provide the 30 percent reimbursement were arbitrary and capricious. The Government answered that WEP II is not entitled to any further recovery because the reduced reimbursement correctly reflects a commensurate reduction in the facility's eligible cost basis under Section 1603. With the issues joined, WEP II filed a motion for summary judgment on June 13, 2014, and the Government filed a cross-motion for summary judgment on July 28, 2014. Both motions have been fully briefed, and the Court held oral argument on December 15, 2014.

Discussion

A. Subject Matter Jurisdiction

The Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491 (2012). The Tucker act establishes Court of Federal Claims jurisdiction and waives sovereign immunity over certain claims against the United States, including those founded upon federal statutes and regulations. Id. The Tucker Act "does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (citing United States v. Mitchell, 463 U.S. 206, 216 (1983) and United States v. Testan, 424 U.S. 392, 398 (1976)). "In the parlance of Tucker Act cases, that source must be 'money-mandating.'" Id. (citing Mitchell, 463 U.S. at 217 and Testan, 424 U.S. at 398). This Court previously has held that Section 1603 is "money mandating," and that it has jurisdiction over Section 1603 disputes. LCM Energy Solutions v. United States, 107 Fed. Cl. 770, 772 (2012); ARRA Energy Co. v. United States, 97 Fed. Cl. 12, 19-20 (2011).

B. Standard of Review

Section 1603 provides "grants for specified energy property in lieu of tax credits" and explicitly adopts the meaning of terms used in I.R.C. Sections 45 and 48. § 1603, 123 Stat. 115, 364, 366. When an applicant pursues a Section 45 or 48 tax credit instead of a Section 1603 reimbursement and receives an unfavorable determination by the IRS, the applicant may file a tax refund suit. In tax refund suits, the Court reviews claims *de novo*, and the plaintiff bears the burden of proof for each claim. D'Avanzo v. United States, 54 Fed. Cl. 183, 186 (2002). Similarly, Section 1603 claimants may file suit after an unfavorable determination by the Treasury Department regarding property that otherwise qualifies for a Section 45 or 48 tax credit. There is no indication in Section 1603 that Congress intended a different standard of review based on Section 1603's provision of direct reimbursement in lieu of tax credits. Accordingly, the Court reviews WEP II's claim *de novo*.

C. Analysis of the Merits

The question presented is whether the phrase "a facility using open-loop biomass to produce electricity," contained in I.R.C. Section 45 and applied to Section 1603, necessarily includes the entire cost basis of facilities that use open-loop biomass and produce electricity, regardless of other purposes and capabilities, or whether the phrase

implicitly contains limitations to the eligible cost basis of the grant.  Based on the subsequent IRS notice and Treasury Guidance, the Court finds that Section 1603 grants are properly restrained by the limitations on eligible cost basis found in the Treasury Guidance.

### 1. Interpretation of I.R.C. Section 45 as applied to Section 1603

WEP II contends that under Sections 1603, I.R.C. Sections 45 and 48, the Treasury Guidance, and all other related authorities, WEP II is entitled to the full reimbursement amount of its original Section 1603 application.  In response, the Government argues that the applicable authorities, and specifically the IRS Notice and Treasury Guidance, limit the eligible basis of Section 1603 grants to the components necessary for electricity production, and require the eligible costs to be reasonably allocated between qualifying and non-qualifying activities.  As a threshold matter, although neither the Government nor WEP II challenges the validity of the agency's interpretation of I.R.C. Section 45, the Court must determine whether the IRS Notice and the Treasury Guidance demand deference as agency interpretations of Section 1603.

The Supreme Court has articulated two different standards of deference to agency interpretations of statutes.  Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984); Skidmore v. Swift & Co., 323 U.S. 134 (1944); see United States v. Mead Corp., 533 U.S. 218, 221 (2001); Cathedral Candle Co. v. United States Int'l Trade Comm'n, 400 F.3d 1352, 1365 (Fed. Cir. 2005).  In Chevron, the Supreme Court established the primary test for determining whether to afford deference to an agency's interpretation of a law which the agency administers.  See Chevron, 467 U.S. at 842-43.  The first step under Chevron is to determine if Congress has directly spoken to the precise question at issue.  If so, the Court should give effect to any unambiguously expressed intent of Congress.  Id.  However, if Congress is silent or ambiguous as to a given issue, the Court must determine whether the agency's interpretation is based on a permissible construction of the statute.  Id. at 843.  Here, the Court finds that Congressional intent regarding the eligible cost basis for reimbursement lacks precision.  The Court cannot ascribe a clear meaning to an "integral part of the facility" in IRC Section 48 and "using open-loop biomass to produce electricity" in IRC Section 45, as well as the complex interplay between the Internal Revenue Code, the Recovery Act, and the Treasury's administration of reimbursements.  Therefore, the Court may examine the agency's interpretation of the law.

However, the Federal Circuit has held that the Chevron standard applies when "Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory

circumstances.'"  Cathedral Candle, 400 F.3d at 1361 (quoting Mead, 533 U.S. at 229). Although Chevron deference does not require "notice and comment rulemaking or formal adjudication, . . . the Court has looked for indications that Congress meant to delegate to the agency the authority to make determinations having the force of law."  Cathedral Candle, 400 F.3d at 1361 (citing Barnhart v. Walton, 535 U.S. 212, 219-22 (2002) (applying Chevron deference to an administrative interpretation with a "longstanding" duration dating to the 1960's)).

Here, the IRS Notice and the Treasury Guidance should not be afforded Chevron deference.  First, the Treasury Guidance and IRS Notice were not created through a formal rulemaking process, but instead reflect only guidance for Section 1603 and Section 45, respectively.  See I.R.S. Notice 2008-60 § 1 ("[t]his notice sets forth interim guidance, pending the issuance of regulations"); Treasury Guidance at 2 ("[t]his Guidance . . . is intended to clarify the eligibility requirements under [Section 1603]"). Moreover, unlike in Barnhart, neither the 2008 Notice nor the 2009 Treasury Guidance can be appropriately considered "longstanding."  Although Section 1603 provides the Treasury Department some authority to recapture grant funds in certain limited circumstances, there is no indication that Congress explicitly or implicitly delegated broad interpretive authority to the agency.  Accordingly, the IRS Notice and Treasury Guidance should not be afforded Chevron deference.

When Chevron deference does not apply, the agency's interpretation may still be subject to a lesser standard of deference articulated in Skidmore v. Swift & Co., 323 U.S. 134 (1944).  The application of Skidmore deference depends upon the circumstances of the case and requires courts to give "some deference to informal agency interpretations of ambiguous statutory dictates."  Cathedral Candle, 400 F.3d at 1365.  Courts have evaluated "the degree of the agency's care, its consistency, formality, [] relative expertness, and [] persuasiveness of the agency's position."  Mead, 533 U.S. at 228 (footnotes omitted) (citing Skidmore, 323 U.S. at 139-40).  Overall, the level of deference depends "'upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'"  Id (quoting Skidmore, 323 U.S. at 140).  Skidmore deference has "produced a spectrum of judicial responses, from great respect . . . to near indifference."  Id.; see Wos v. E.M.A. ex rel. Johnson, 133 S.Ct. 1391, 1402 (2013) (quoting Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000) (quoting Skidmore, 323 U.S. at 140) ("'[i]nterpretations such as those in opinion letters'" . . . are "'entitled to respect'" in proportion to their "'power to persuade'"))); Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 136 (1997) ("Director's reasonable interpretation . . . brings at least some added persuasive force"); Reno v. Koray, 515 U.S. 50, 61 (1995) (internal agency guidelines "still entitled to some deference"); Martin v. Occupational

Safety and Health Review Comm'n, 499 U.S. 144, 157 (1991) ("informal interpretations are still entitled to some weight on judicial review").  On balance, the Court will defer to an agency's interpretation if the agency has conducted a "careful analysis of the statutory issue," maintained a "consistent and [] agency-wide policy," and the position "constitutes a reasonable conclusion to the proper construction of the statute, even if [the Court] might not have adopted the construction without the benefit of the agency's analysis." Cathedral Candle, 400 F.3d at 1366.

The I.R.S. Notice and the Treasury Guidance merit deference for at least four reasons.  First, as in Cathedral Candle, the IRS Notice and the Treasury Guidance here represent agency-wide policy, and not a low-level determination.  Second, the IRS Notice was published in 2008, prior to the enactment of the Recovery Act, and the Treasury Guidance was published only five months after the signing of the Recovery Act.  Neither source was "formulated belatedly in response to litigation in this case or others." Cathedral Candle, 400 F.3d at 1367.  Instead, the Guidance was published to "[establish] the procedures for applying for payments under the Section 1603 program" and to "clarify the eligibility requirements under the program." Treasury Guidance at 2.  Third, the reasons for the policies are clear, which include limiting the reimbursements granted to the costs attributable to producing electricity from open-loop biomass, the primary incentive established in Section 1603.  Lastly, the Treasury Department is explicitly granted recapture authority for any grants to property that ceases to be "specified energy property" in "such manner as the Secretary of the Treasury determines appropriate." § 1603(f), 123 Stat. at 365.  The recapture authority and accompanying discretion afforded to the Treasury Department suggest Congress's intent to defer to the agency with the administration of this law, much like the International Trade Commission in Cathedral Candle. 400 F.3d at 1367.

The one limiting factor for the Treasury Department here is the inconsistency of its interpretation as applied to past reimbursements.  The Treasury Department fully reimbursed another W.E. Partners energy facility, WEP I, which contained two boilers and the same size electric turbine, suggesting that the agency has previously approved grants where the boilers produce more steam than necessary for the turbine.  However, the Government now regards the full reimbursement to WEP I as an agency mistake, and asks the Court to give that decision no weight in determining the applicable law.  As "the manifest weight of precedent rejects a 'least common denominator' notion of federal taxation," the Court is persuaded that a prior favorable reimbursement is not binding for future Treasury interpretations of Section 1603.  See Vons Cos., Inc. v. United States, 51 Fed. Cl. 1, 10 n.10 (2001).

Accordingly, the Court finds that the Treasury Department's interpretation of Section 1603 is entitled to considerable weight as a reasonable interpretation of the

statute and a reasonable limitation consistent with the intent of Congress. The Treasury Guidance properly restrains the broad language of Section 1603. Thus, under Section 1603 and the applicable guidance, the Court must determine (1) whether the WEP II facility is a "qualified facility" for Section 1603 reimbursement, (2) if the WEP II facility is a qualified facility, what property is qualifying, and (3) of the qualifying property, what costs are eligible for reimbursement.

### 2. Qualifying Facilities

To qualify for a Section 1603 reimbursement, a facility must be a "qualifying facility" as defined in I.R.C. Section 45. § 1603(d)(1), 123 Stat. at 365. Qualifying open-loop biomass facilities include "a facility using open-loop biomass to produce electricity . . . the construction of which begins before January 1, 2014." I.R.C. § 45(d)(3)(A). The WEP II facility began construction prior to January 1, 2014 and burns biomass to produce electricity. Although there is some ambiguity as to whether Section 1603 applies to cogeneration facilities that do not qualify as combined heat and power facilities under Section 1603(d)(7), the Government does not seriously contest this issue. See 123 Stat. at 365. Thus, WEP II is a qualifying facility under Section 45.

### 3. Qualifying Property

Within a qualified facility, only qualified property is eligible for Section 1603 reimbursement. Section 1603(d)(1) uses the definition of qualified property contained in I.R.C. Section 48. § 1603(d)(1), 123 Stat. at 365. The provision at issue here provides that qualified property means "tangible personal property" or "tangible property (not including a building or its structural components), but only if such property is used as an integral part of the qualified investment credit facility." I.R.C. § 48(a)(5)(D). I.R.S. Notice 2008-60 further defines qualifying property as all "components necessary for the production of electricity from open-loop biomass." § 3.01(1). Finally, the Treasury Guidance defines qualifying property as "property that is an integral part of a qualified facility." Treasury Guidance at 12-13.

WEP II asserts there is no evidence that "the facility must be one whose 'primary function' is to produce electricity." Pl.'s Mot. Summ. J. 5. However, as clarified by Notice 2008-60, only those components necessary for the production of electricity are qualified property. Moreover, the Treasury Guidance provides that qualifying property is property that is an integral part of a qualified facility, here being a facility using open-loop biomass to produce electricity. In each provision, the eligibility of property within a facility requires both the use of open-loop biomass and the production of electricity.

The Government contends that not all components of the WEP II facility are qualifying property because WEP II is primarily a steam facility and includes boilers that are not necessary for the production of electricity. The Government bases this conclusion on its calculation that 495 kW of electricity could be produced with a heat input of 8.4 to 11.2 mmBtu, or approximately one-third of the heat produced by WEP II's three-boiler system. The Government does not, however, identify any property in the WEP II facility that remains unused in the production of electricity, but instead refers to property that is used for both the production of electricity and other nonqualifying activities. More specifically, although the WEP II facility's boilers produce both nonqualifying thermal energy and qualifying electrical energy, all steam produced by the boilers and passing through the turbine contributes to the generation of electricity. Therefore, every part of the facility is qualifying property necessary to the production of that electricity. Neither the Guidance nor the statute require the facility to be designed purely for electrical production, and neither defines qualifying property "necessary for the production of electricity" as meaning "only for the production of electricity" or "only as much as necessary to generate the amount of electricity actually generated." Instead, the Court finds that property "necessary for the production of electricity" includes the property that is actually involved in making electricity, and without which the electrical production would be reduced. Thus, the Government's hypothetical facility that maximizes the efficiency of electrical production is irrelevant to the determination of qualifying property in this case. All three boilers send steam through the turbine, and thus all three boilers are necessary to the production of electricity generated therefrom.

The Government further explains that the facility includes a pressure-reducing valve (PRV) that can bypass the electricity-generating turbine. The PRV was used by WEP II on twelve to fifteen percent of the facility's operating days. Although use of the PRV undoubtedly reduces the amount of electricity generated, the fact that steam may occasionally bypass the turbine through the PRV does not alone disqualify WEP II's otherwise qualifying property. The Government also contends that Congress could not have intended any de minimis electricity production to qualify property otherwise ineligible for Section 1603 reimbursement, but does not identify any statutory provision that supports that limitation. To the contrary, the Treasury Guidance specifically contemplates property relating to both nonqualifying and qualifying activity. Treasury Guidance at 17. Thus, all of the WEP II property is qualifying property. Nonetheless, as described below, only a portion of the qualifying property's costs are eligible for Section 1603 reimbursement.

    4.  <u>Eligible Cost Basis</u>

Regarding costs associated with both qualifying and nonqualifying activities, the Treasury Guidance provides that "the costs must be reasonably allocated between the

nonqualifying and qualifying activities," and illustrates this allocation with a hypothetical facility burning both biomass and another nonqualifying fuel.  Treasury Guidance at 17.  WEP II contends that it is entitled to the full reimbursement requested because "[t]here is nothing in Section 1603 or the related authorities that supports Treasury's arbitrary decision to cut the requested grant amount by two-thirds."  Pl.'s Reply Supp. Mot. Summ. J. 8.  In response to the Treasury Guidance, WEP II asserts that the Guidance "has nothing to do with the issue before the Court" because it relates only to the type of fuel used at a qualified facility.  Id. at 5.  Although the Treasury Guidance illustrates the eligible cost basis of a facility using qualifying and nonqualifying fuel as an example, there is no indication that the Guidance applied exclusively to fuel type.  To the contrary, the Treasury Guidance's use of the phrase "for example" while introducing the hypothetical facility indicates that there are other, different scenarios where costs must be allocated between nonqualifying and qualifying activities.  In this case, the eligible cost basis of qualifying property must be reasonably allocated between the nonqualifying chicken rendering processes and the qualifying electricity generation.  WEP II further contends that its facility was the only economically viable design that suited the needs of the chicken rendering plant.  WEP II does not, however, cite any authority indicating that economic viability is a factor in determining what constitutes an eligible cost basis for a section 1603 reimbursement.  Instead, qualifying property and eligible cost basis are defined by I.R.C. Section 48 and the relevant portions of the subsequent IRS Notice and Treasury Guidance.

This Court previously held that the government "may decide . . . that an applicant has miscalculated or misrepresented the basis of its property, [but] it has no discretion to reimburse an applicant for less than, or more than, thirty percent of the correct basis of that property."  ARRA Energy, 97 Fed. Cl. at 21.  Pursuant to the Treasury Guidance, the Treasury Department determined that 8.4 and 11.2 mmBtu of steam would be sufficient to generate 495 kW, the amount produced by WEP II's turbine.  Thus, one of WEP II's three 29.4 mmBtu boilers reasonably could be allocated to the qualifying activity of generating electricity.  Based on these calculations, the Treasury Department awarded WEP II a 30 percent reimbursement for the full cost of the turbine and one-third of all other costs.  In light of the WEP II facility's substantial thermal energy production and comparatively small electrical generation, the Court concludes that the Treasury Department's determination of the WEP II facility's eligible cost basis is a reasonable allocation of the costs between the generation of qualifying electrical energy and nonqualifying thermal energy.

<u>Conclusion</u>

For the reasons set forth above, the Court finds in favor of the Defendant. Plaintiff's motion for summary judgment is DENIED, and Defendant's cross-motion for summary judgment is GRANTED. Plaintiff's complaint shall be dismissed with prejudice. No costs.

IT IS SO ORDERED.

<u>s/ Thomas C. Wheeler</u>
THOMAS C. WHEELER
Judge